UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

DAVID WILLIAMS                                    PLAINTIFF

v.                              CIVIL ACTION NO: 2:17cv152

INV. SGT. JASON MYERS, et al.                    DEFENDANTS


TRANSCRIPT OF OMNIBUS/SCREENING PROCEEDINGS


MONDAY, JULY 2, 2018


BEFORE HONORABLE MICHAEL T. PARKER
UNITED STATES MAGISTRATE JUDGE


COURT REPORTER:

FRED W. JESKE, RMR, CRR
701 NORTH MAIN STREET, SUITE 228
HATTIESBURG, MISSISSIPPI  39401
(601) 255-6432
fred_jeske@mssd.uscourts.gov



1    APPEARANCES:

2    REPRESENTING THE PLAINTIFF:

3        David Williams, 83234, PRO SE
        East Mississippi Correctional Facility
4        10641 Highway 80 West
        Meridian, MS 39307

5

6    REPRESENTING THE DEFENDANTS:

7        JESSICA S. MALONE, ESQUIRE
        Allen, Allen, Breeland & Allen, PLLC
8        P.O. Box 751
        214 Justice Street (39601)
9        Brookhaven, MS 39602-0751
        601/833-4361
10       jmalone@aabalegal.com

11                      -oOo-

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2         THE COURT:  The next matter on the docket is David
 3   Williams versus Jason Myers and others.   The other defendants
 4   are Sheriff Alex Hodge, Officer Jeff Monk, and Jones County.
 5       The case number is 2:17cv152.
 6       Is Mr. Williams present in the courtroom?
 7         MR. WILLIAMS:  Yes, sir.
 8         THE COURT:  Are you Mr. Williams?
 9         MR. WILLIAMS:  Yes, sir.
10         THE COURT:  All right.  If you'll come up here to the
11   microphone for me, please.
12       Good afternoon, sir.  Would you tell me your name?
13         MR. WILLIAMS:  David Williams.
14         THE COURT:  All right.  Mr. Williams, good afternoon.
15       And who is here on behalf of the defendants?
16         MS. MALONE:  Your Honor, Jessica Malone on behalf of
17   the defendants.
18         THE COURT:  All right.  Thank you.
19       All right.  Mr. Williams, before we begin, if you would
20   raise your right hand and be sworn, please, sir.
21
22
23
24
25
```

1          DAVID WILLIAMS,

2     having been first duly sworn, testified as follows:

3                    EXAMINATION

4    BY THE COURT:

5    Q.  All right.  Again, you are David Williams; is that correct?

6    A.  Yes, sir.

7    Q.  All right.  Mr. Williams, you have been sitting in the

8    courtroom for the last 45 minutes, so you've sat through one of

9    these hearings.

10   A.  Yes, sir.

11   Q.  And so you have some idea of how I'll approach this; right?

12   A.  Yes, sir.

13   Q.  Okay.  Did you receive the order that I entered setting

14   this hearing today?

15   A.  Yes, sir.

16   Q.  Are you able to read and write?

17   A.  Yes, sir.

18   Q.  Okay.  And so are you prepared to proceed and to do the

19   things that are outlined in the order?

20   A.  Yes, sir.

21   Q.  Okay.  Again, my name is Mike Parker.  I'm the magistrate

22   judge assigned to your case.

23       In the case previous to yours I explained the consent

24   process, that is, the process by which the parties, if they so

25   choose, may consent to have the magistrate judge hear the

1    entire case, make the final decision and conduct the trial.

2        The parties certainly are not required to do that; that's a

3    voluntary thing.  The parties have a right, if they so choose,

4    to have the case heard by the district judge.  The district

5    judge's courtroom is next to this one in this courthouse.

6        It doesn't matter to the judges who hears the case, because

7    we both have lots of cases to hear, and if we have one more or

8    one less, it's not going to make a whole lot of difference

9    because that's what we do, we're going to hear somebody's case,

10   whether it's yours or someone else's.  No matter which judge

11   hears the case, we'll hear the same facts, apply the same law,

12   follow the same procedures, ought to make the same decision.

13   No matter who hears the case, you have the same right to trial.

14   If you're dissatisfied with the decision, if I hear the case,

15   you can appeal to the Fifth Circuit Court of Appeals; if you're

16   dissatisfied if the district judge hears the case, you can also

17   appeal to the Fifth Circuit Court of Appeals.

18       You're not penalized if you don't agree to the magistrate

19   judge hearing the case.  You don't lose any rights.  It doesn't

20   change anything.  It's more of a who is going to hear the case.

21       Again, about the only difference is that in our district

22   the magistrate judges typically hear the prisoner cases, and

23   for that reason may get to it a tad quicker, but there is no

24   real significant difference.

25       Do you understand?

```
 1   A.   Yes, sir.
 2   Q.   The defense may withhold consent also, or may consent.   If
 3   you withhold consent you're not penalized in any way.   How do
 4   you want to proceed?   Do you agree to consent to the magistrate
 5   judge to hear the case or would you rather it stay like it is?
 6   A.   I feel comfortable with you hearing, hearing the case, sir.
 7   Q.   All right.   Does that mean you consent to the magistrate
 8   judge hearing case?
 9   A.   Yes, sir.
10            THE COURT:   All right.   What says the defendants?
11            MS. MALONE:   Defendants consent as well, Your Honor.
12            THE COURT:   All right.   Before I will accept consent
13   from you, I have a few questions for you, because I'll only
14   accept consent if it's voluntary and everybody understands the
15   implications.
16   Q.   You agreeing for the magistrate judge to hear the case, are
17   you doing that voluntarily?
18   A.   Yes, sir.
19   Q.   Do you feel like you're being pressured or coerced to do
20   that?
21   A.   No.   No, sir, I'm voluntary.   I understand.
22   Q.   All right.   You do this of your own free will?
23   A.   Yes, sir.
24   Q.   All right.   I sense that, but it's my duty to make a record
25   about this, and so I want to ask those questions to make sure
```

1   that it's voluntary.

2       Do you understand that if all parties consent, the case

3   will be assigned to the magistrate judge and I'll make whatever

4   decisions to be made in the case and you have the right to

5   appeal once the case is decided to the Fifth Circuit Court of

6   Appeals if you disagree?

7   A.  Yes, sir.

8   Q.  And do you understand that if you didn't want to consent,

9   it wouldn't be held against you; you don't lose any rights.

10  The gentleman ahead of you didn't consent and his case will be

11  heard the same way as yours.  Do you understand?

12  A.  Yes.  Yes, sir.

13  Q.  All right.  Is that what you want to do, consent?

14  A.  Yes, sir.

15  Q.  All right.  Are you able to read and write?

16  A.  Yes, sir.

17  Q.  How far did you go through school?

18  A.  Eleventh grade.  But I have a GED.

19  Q.  All right.  You completed the 11th grade and you have a

20  GED.

21  A.  Yes, sir.

22  Q.  Okay.  Nevertheless, I place a form in front of somebody, I

23  want to be clear that they understand what they're signing.

24  You'll be handed a form that says Notice, Consent and Reference

25  of a Civil Action to a Magistrate Judge.

1        It reminds you that the magistrate judge is available to

2    hear the case and to try it and to enter the final judgment,

3    which you may appeal like any other judgment, and that I will

4    only exercise this authority if all parties voluntarily

5    consent.

6        You can withhold consent, that is, you don't have to agree

7    to this, and you wouldn't be penalized in any way.  Do you

8    understand?

9    A.   Yes, sir.

10   Q.   All right.  Knowing that, do you wish to consent?

11   A.   Yes, sir.

12   Q.   All right.  You'll be handed this form.  I'll need you to

13   print your name and then sign it and date it next to it.

14       Today is July the 2nd.

15       And then the defense likewise would need to execute the

16   form.

17       Once the district judge receives that form, if it's in

18   order, he'll assign the case.

19       Pardon?  Did you have a question?

20            THE WITNESS:  I thought I had to sign it and print it.

21            THE CLERK:  He did.  There is a printed and a

22   signature.

23            THE COURT:  Okay.  We'll hand it back to you to do

24   that.  Says he needs to print his on there.  He signed but he

25   didn't print it.  He needs to do that.

1    BY THE COURT:

2    Q.  All right.  Thank you.

3        All right.  Let's talk about your case a little bit.  First

4    of all, how old are you?

5    A.  Forty-three.

6    Q.  And you're incarcerated or being held where right now?

7    A.  East Mississippi Correctional Facility in Lauderdale

8    County.

9    Q.  Okay.  And you're there after having been convicted of a

10   crime of some type?

11   A.  Yes, sir.

12   Q.  What?

13   A.  Receiving stolen property.

14   Q.  Receiving stolen property.  Okay.  In what county were you

15   convicted?

16   A.  Jones.  Jones County.

17   Q.  Okay.  Now the lawsuit you filed has to do with things that

18   occurred in Jones County; is that right?

19   A.  Yes, sir.

20   Q.  That may arise out of your arrest?

21   A.  Yes, sir.

22   Q.  Okay.  And I've read the things that you have filed, and I

23   believe I understand your complaint, but I want to go through

24   it and make certain that I, that I do and allow you to make

25   clarifications, okay?

1   A.   Yes, sir.

2   Q.   I will ask you questions and if for some reason you don't

3   understand me or if I ask a question that's not clear or you

4   just don't understand it, you say so and I'll rephrase it,

5   because it's important that I understand you and you understand

6   me.

7   A.   Yes, sir.

8   Q.   Will you tell me if you don't understand a question?

9   A.   Yes.  Yes, sir.

10   Q.   Okay.  You recognize you're under oath at this time?

11   A.   Yes, sir.

12   Q.   Okay.  Now the events that you described in your complaint

13   have to do with something that occurred around December

14   the 14th of 2016; is that right?

15   A.   Yes, sir.

16   Q.   When you were -- apparently your vehicle was stopped?

17   A.   Yes, sir.

18   Q.   Okay.  Take me through that, you -- how you -- how and why

19   you were stopped.

20   A.   They had -- they had an MDOC warrant for me, I think, is

21   what the initial stop was, traffic stop was for.  I pulled my

22   truck in to a residence.  I didn't know who was there.  I just

23   pulled in their yard and I jumped out of my truck and ran, and

24   probably from here to the door, the officer shot me with a

25   Taser, and I fell, and then the other officers come and they

1  stomped me and beat me, beat me into the ground.

2  Q.  Okay.  I want to hear more about that, but I have some

3  backup questions, though.  You said there was an MDOC warrant.

4  Is that Mississippi Department of Corrections?

5  A.  Yes, sir.

6  Q.  Why would they have a warrant for you?

7  A.  I think it's not paying my fines, not reporting on time for

8  probation.

9  Q.  Okay.  So you were on probation?

10  A.  Yes, sir.

11  Q.  For a prior felony conviction?

12  A.  Yes, sir.

13  Q.  Okay.  And, and what was that prior felony conviction for?

14  A.  Forgery.

15  Q.  Forgery.

16    And where was that conviction, was it also in Jones County?

17  A.  12th month of 2006 in Jones County.

18  Q.  Okay.  So you were on probation at the time for forgery.

19  A.  Yes, sir.

20  Q.  Okay.  And there was a warrant for your arrest.

21  A.  Yes, sir.

22  Q.  And so you said they pulled you over.  Were these Jones

23  County deputies?

24  A.  Jones County deputies and, and -- I think, I think -- yes,

25  sir, Jones County and Jasper County, it was joint.  It was a

1    joint.

2    Q.   I see.  But whichever deputies it was attempted to stop you

3    and you pulled into a residence from somebody you didn't know;

4    right?

5    A.   Yes, sir.

6    Q.   And then you took off running?

7    A.   Yes, sir.

8    Q.   Why did you do that?

9    A.   Just to be honest with you, I didn't want to go to jail.

10   Q.   Okay.  All right.  And so -- but you didn't get far before

11   one of the officers hit you with a Taser.

12   A.   Yes, sir.

13   Q.   Okay.  And your claims arise out of how you were treated

14   after that, the Tasing, and then you say you were roughed up

15   also.

16   A.   Yes, sir.

17   Q.   Okay.  I want to talk about that.

18        Now who is it that Tased you?

19   A.   I think they're -- I know Jason Myers is the first one I

20   seen.  Now I'm told in the last couple months that Joseph White

21   was the one that actually shot the Taser.

22        I can only honestly say that the first face that I

23   recognized was Jason Myers because he was, he was the one

24   immediately there after I fell.

25   Q.   Okay.  Well, Jason Myers moved to substitute Joseph White,

1  saying that Joseph White did it and that Joseph White would be

2  in the lawsuit in his place.  But you objected to that.

3  A.  Because what I said and why I objected to that because I do

4  know for a fact that Jason Myers stomped me and raised me up an

5  elbow more than one time.  I know he assaulted me.

6  Q.  Okay.  All right.  Well, let me hear about that.

7      So one of the officers hit you with a Taser, but you --

8  again, do you know who it was?

9  A.  I thought it was Jason Myers.  I've always thought the

10  whole time it was Jason Myers because he was the first one I

11  seen.

12  Q.  Okay.  But could you swear to it that that's who it was?

13  A.  Honestly, I can't swear to it.

14  Q.  Okay.

15  A.  That it was him that pulled the trigger, Taser, whatever

16  you call it.

17  Q.  Okay.  And so after you were hit with a Taser you went to

18  the ground?

19  A.  Yes, sir.

20  Q.  And then tell me what happened.

21  A.  To be honest, they didn't -- it didn't hurt.  I mean, not

22  as far as pain-wise, but I couldn't, I couldn't move.

23  Q.  Um-hum.

24  A.  And then that's when I seen Jason Myers come and grab me by

25  the back of the collar and kick me and --

1    Q.  When you say kicked you, how and where?

2    A.  In my head, in the back of my head.  Like three -- several

3    times, and again I'm not trying to sound tough or nothing, but

4    it didn't hurt.  I didn't feel anything after the Tasing.  But

5    I kept wondering why, you know?  Because honestly I couldn't

6    resist.  I was already rendered helpless.

7        And then they let me up and Jeff Monk came and kicked me in

8    my face, my jaw.  And that's, that's the next thing I thought,

9    my jaw's broke, because I couldn't talk.  But it ended up being

10   a speech impediment through the injury to my head.

11   Q.  I see.  So are you claiming that one of the injuries you

12   suffered from being kicked or roughed up was that you developed

13   a speech problem?

14   A.  Yes, sir.  And I have seizures, seizures now.  And a severe

15   headache all the time.  The light makes it even worse, so I

16   finally got tinted glasses, and it helps through that.

17   Q.  Okay.  So you're claiming that someone Tased you, you're

18   not sure who, but that while you were on the ground Myers

19   kicked you in the back of the head three times?

20   A.  Myers, Myers kicked me several times and Jeff Monk kicked

21   me in the face.

22   Q.  Kicked you in the face?

23   A.  Yes, sir.

24   Q.  Were you resisting at the time?

25   A.  No, sir, I was not resisting, from the moment that they

```
 1   shot me.
 2   Q.   Were you in cuffs at the time?
 3   A.   No, sir.
 4   Q.   Okay.  And you claim that as a result of that, you've
 5   suffered injuries in the form of a speech impediment, you're
 6   sensitive to light, and you have headaches?
 7   A.   Yes, sir.  And seizures.
 8   Q.   And seizures.
 9        Well, tell me about the seizures.  What kind of seizures?
10   A.   They're, they're -- they just -- the first one I had, I
11   didn't -- I mean, I never had seizures my whole entire life,
12   and actually the nurse at the -- the nurse at the jail, they
13   thought I had a stroke.
14   Q.   Where did you have your first seizure?
15   A.   At the jail.
16   Q.   Is that in Jones County?
17   A.   Yes, sir.
18   Q.   Now, you know, I've heard people having different types of
19   seizures.  When you have one, what happens?
20   A.   I fall.  If I'm -- like if I'm standing here, I fall, I
21   have no control over my body.  I have no control over anything.
22   Q.   Do you shake or do you black out, or what?
23   A.   Yes, sir, blackout.  I don't really what happens.
24   Sometimes they last till the nurse gets there, but sometimes
25   I'm already -- by the time the nurse gets there, I'm already
```

1    aware that I can -- you know, I can communicate with people.

2    Q.   And Jason Myers works with who?

3    A.   Jones County.

4    Q.   With Jones County?

5    A.   Yes, sir.

6    Q.   And Jeff Monk, who is he with?

7    A.   He's with Jones County, too.

8    Q.   All right.  Now, have you told me the reasons that you've

9    sued Myers and Monk, that they kicked you and roughed you up

10   after you were down?

11   A.   Yes, sir.

12   Q.   Okay.  What about Alex Hodge?  You've sued him.  Now he's

13   the sheriff of Jones County; right?

14   A.   Yes, sir.

15   Q.   What are the claims you're bringing against him?

16   A.   I feel like he's responsible for his deputies' actions.

17   Q.   Was he there when all this was going on?  Was he there on

18   the scene?

19   A.   I don't know.  There was a whole lot, whole lot of officers

20   there.  I don't even remember who all was.

21   Q.   Okay.  Understood.  But are you able to swear that you

22   were -- that he was there?

23   A.   No, sir, I cannot swear that he was.

24   Q.   Do you have any information that leads you to believe he

25   was there?

A.   No, sir.   Not -- no, sir.

Q.   So but -- so it's your position, though, that he should be responsible, though, because he's the sheriff?

A.   Yes, sir.   He's, he's -- he has authority over, over his deputies.   Not only for that, because I begged for help down at the jail, ever every time they would take me to the doctor to get a -- the nurse would try to give me an MRI, and the deputy that took me there says he don't have time to sit here that long, that it was his Friday.   So I feel like Alex Hodge should have done better to try to at least help me.

Q.   Okay.   Let me back up there.

     The first thing I read in your materials was that Jones County and Alex Hodge didn't supervise their officers.   Is that why basically you're suing Hodge and the county?

A.   Yes, sir.

Q.   How is it that they should have supervised them differently than they did?   What's your particular claim?

A.   Well, how can you have that many officers that -- I mean I was unarmed, I was wearing -- nobody was in danger when I sprinted out of the truck.   How can you have that many officers willing to do that kind of beatin' somebody for something that -- there was nothing to endanger anybody.

Q.   Okay.   Any other reasons why you sued the county or Hodge?

A.   Just for medical attention.

Q.   All right.

1    A.   I want --

2    Q.   Now tell me about that.   Who are you bringing that claim

3    against, the sheriff, Hodge?

4    A.   Yes, sir.

5         And the jail administration.

6    Q.   Well, there is no such thing as jail administration.

7         Hold on.   Yeah, you're suing either the county or the

8    particular individuals.

9    A.   Yes, sir.

10   Q.   So is this a claim you're bringing against the sheriff and

11   the county?

12   A.   Yes, sir.

13   Q.   All right.   Tell me what it is that they did or didn't do

14   about medical attention that leads you to sue them.   I heard

15   you tell me a while ago that you asked for -- you were supposed

16   to get an MRI, or something like that?

17   A.   Yes, sir.

18   Q.   Okay.   Tell me the reasons that you're bringing this

19   medical claim.   I want to make sure I understand all the facts.

20   A.   From the very, from the very beginning, when I -- when they

21   got me to the jail, I was sitting on a bench.   They was booking

22   me in and I couldn't talk.

23        Well, the nurse and Ms. Angie Guthrie, at the jail, came to

24   the booking department and looked at me and said, No, just

25   stop.   Stop the booking process and get him to the doctor.

1    Well, they took me -- Curtis White and David Harris took me to
2    the Ellisville Clinic.  And told me as we got there, said don't
3    say anything; that they'll do all the talking, which I
4    couldn't, couldn't really talk anyway.  So there they, they
5    x-rayed my jaw and then they gave me a shot, took me back to
6    the jail.  I don't know which -- what it was, but it made me
7    sleep, so...
8        A couple days later I wondered after I had the seizure they
9    took me to the doctor, to the emergency room, and the nurse
10   said that, that I need -- after -- because I explained to her
11   what happened, I never had seizures, or nothing, and she told
12   her sponsor that I needed an MRI, and he refused, he refused to
13   let them give me an MRI.
14   Q.  Who did?
15   A.  Curtis White.
16   Q.  And who is he employed with?
17   A.  With Jones County Sheriff's Department.
18   Q.  And why did he refuse it?
19   A.  He said that he didn't have time.
20       He called somebody on the phone and told them how long it
21   was going to take, and they could either bring somebody down
22   there to sit with me or he would bring me back to the jail
23   because he didn't have time for that.  It was his Friday.
24   Q.  But he was willing to let it happen; he just couldn't do
25   it?

1   A.   Yes, sir.

2   Q.   I mean, there is a difference here, that it's one thing to

3   say I will not allow this man to get medical treatment, it's

4   another thing to say, well, he might could get it, but I can't

5   stay, and somebody else needs to do it.

6   A.   Yes, sir.

7   Q.   Which one was it?

8   A.   I don't know.  I know I did not get the medical treatment.

9   Q.   Okay.  Well, it doesn't sound like it's a claim against him

10  if you say that he said that they were going to have to get

11  somebody else down there because it was time for him to be off,

12  or he was supposed to be off, maybe against the county, if they

13  didn't have somebody?

14  A.   Yes, sir.  That's why I named the county instead of him

15  personally.

16  Q.   Okay.  All right.  So you got a claim against the county.

17       But let me back up now.

18       You were seen by a doctor that very night; right?

19  A.   Yes, sir.

20  Q.   And you said they x-rayed your jaw.

21  A.   Yes, sir.

22  Q.   And this was at the Ellisville Clinic?

23  A.   Yes, sir.

24  Q.   Was your jaw broken?

25  A.   No.  No, sir.

Q.   Okay.  And then would you say you had your first seizure a few days later?

A.   Somewhere, somewhere within the week, yes, sir.

Q.   And they immediately took you to the emergency room?

A.   Yes, sir.

Q.   And they did what?

A.   They did, they did a CAT scan to make sure, when I fell and hit my head, made sure I had no head trauma.

Q.   Okay.  So did a CAT scan.

A.   Yes, sir.

     And then the nurse said that by me having the seizure from, from the injury, that I needed an MRI.  So tried to find out from there.  I don't know what.

Q.   Did you ever have an MRI?

A.   No.  No, sir.

Q.   Okay.  Have you had one since?

A.   No, sir.  Every facility I've been sent to, I filled out sick calls and seen the doctors there, and one doctor told me that it was not life threatening, that they had my seizures under control by medication.

Q.   Okay.  Are you taking medication for your seizures?

A.   Yes, sir.

Q.   How long did you remain in the Jones County jail after this incident?

A.   I think, I think it was altogether about two weeks.

1    Q.   About two weeks?

2    A.   Yes.  Yes, sir.

3    Q.   All right.  So you were only in the Jones County jail about

4    two weeks?

5    A.   Yes, sir.

6    Q.   And you went to the doctor the night you came in, and then

7    a few days later when you had a seizure?

8    A.   Yes, sir.

9    Q.   Did you see any other doctors while you were there, or have

10   any other medical --

11   A.   Dr. Donnie Scoggins, he was there.  A couple times I seen

12   him.

13   Q.   Donnie Scoggins you said?

14   A.   Yes, sir.

15   Q.   Was he at the jail itself?

16   A.   Yes, sir.

17   Q.   All right.  Now, how did you arrange to see him?

18   A.   The nurse at the jail would take me in there.  He comes, he

19   comes to the jail like once or twice a week, treats the

20   patients there.

21   Q.   Okay.  So he made rounds at the jail.

22   A.   Yes, sir.

23   Q.   So it's fair to say that you were, in that two-week period,

24   you were treated at least four times.  That night, then a few

25   days later at the Ellisville Clinic, and then by Dr. Scroggins

1   a couple of times.

2   A.   Dr. Scoggins came in to see me.  He never treated me.  He

3   just, he just seen me, take my blood pressure or whatever, and

4   asked me what happened.

5   Q.   But he saw you, and whatever he did, but whatever judgment

6   he exercised, he did see you and talk to you about your

7   injuries?

8   A.   Yes, sir.

9   Q.   Did you take any medications while you were there at the

10   Jones County jail?

11   A.   They -- no, sir.  No, sir.  Not -- not when I was there

12   that time.

13   Q.   Okay.

14   A.   I didn't start the medication until I got to prison.

15   Q.   Okay.  So you were out of the Jones County jail within a

16   couple of weeks.

17   A.   Yes, sir.

18   Q.   And started on medications later?

19   A.   Yes, sir.

20   Q.   When you were in the MDOC custody?

21   A.   Yes, sir.

22   Q.   Is that accurate?

23   A.   Yes, sir.

24   Q.   Okay.  So we've got two claims here, as I understand it, or

25   perhaps three.  One, excessive force claims arising out of the

1    arrest.

2    A.   Yes, sir.

3    Q.   Two, failure to supervise or train the officers against the

4    county and Alex Hodge?

5    A.   Yes, sir.

6    Q.   And then, three, a claim against the county and the sheriff

7    for not arranging for the MRI.

8    A.   Yes, sir.

9    Q.   Is that accurate?

10   A.   Yes, sir.

11   Q.   Okay.  Getting back to that failure to train or supervise,

12   can you point to anything in particular about the training of

13   the officers that's deficient?  Do you know of anything?

14   A.   All I know is I don't, I don't think that they were

15   trained.  Stomp people in the head when they're rendered

16   helpless by a Taser gun.

17   Q.   Right.  But what if they were trained not to do that?

18   A.   Well, then surely they wouldn't have done it, right?

19   Q.   It's your belief that if a person is trained to do

20   something, they would never violate the training?

21   A.   I don't know.  I've never been in a situation like this

22   before in my life.  I really don't know what --

23   Q.   I understand that.  And a lot of these things you can't

24   know.  But that's the point.  Do you know what training, if

25   any, these officers received?

1    A.   No, sir.  But I'm not sure it's not, not to beat people.

2    Q.   Okay.  Well, do you know if they were trained to beat

3    people?

4    A.   Have no idea.  They did a, did a good job.

5    Q.   Okay.  And do you know how they were supervised and who

6    made the decisions that night?

7    A.   No, sir.

8              THE COURT:  Okay.  All right.  Does the defense have

9    information they'd like to have clarified?

10        If so, I'll be happy to attempt to do that.

11             MS. MALONE:  Your Honor, just looking at his file

12   here, it would appear that he came back into Jones County's

13   custody at some point, because I've got some medical records

14   after that, January 2017 -- well, it would have been just a

15   couple weeks there.

16        So it's clear that he received some medical treatment at

17   Jones County.

18             THE COURT:  Okay.

19   BY THE COURT:

20   Q.   You indicated that this incident occurred approximately

21   when?

22   A.   December the 14th, 2016.

23   Q.   And within a couple of weeks you were back in MDOC custody?

24   A.   Yes, sir.  And I've been back at the Jones County jail

25   about four or five times since then.

1    Q.  Okay.  So -- but the things you're complaining about

2    occurred during that two-week period?

3    A.  Yes, sir.

4    Q.  Not the subsequent visits?

5    A.  Yes, sir.

6    Q.  All right.  Why were you back in the Jones County jail?

7    A.  The charges that I was arrested for, I had to come, get

8    arraigned, and then I had to come back for indictment.  I have

9    been back several times.

10    Q.  I see.  So when you were only there for about two weeks is

11    because your probation was revoked and you were sent back to

12    jail?

13    A.  Yes, sir.

14    Q.  But MDOC, or the Department of Corrections, would send you

15    back to Jones County from time to time for matters related to

16    the --

17    A.  For these issues, yes, sir.

18    Q.  For another criminal charge?

19    A.  Yes, sir.

20    Q.  Okay.  But again, for clarity, just to be sure, the lawsuit

21    you're bringing is over your being subjected to excessive force

22    when you were arrested, and that period where you claim you

23    were not given the MRI there at the jail?

24    A.  Yes, sir.

25    Q.  Okay.  Okay.

| 1 | THE COURT:  All right.  Other clarifications? |

1           THE COURT:  All right.  Other clarifications?

2           MS. MALONE:  That's all I had, Your Honor.

3 BY THE COURT:

4 Q.  Now you've mentioned a -- was it another person, Mr. White?

5 A.  Joseph White?

6 Q.  Right.

7 A.  I received a letter from, from the defendant's lawyers, I

8 think, from Jason Myers.

9 Q.  Yes.

10 A.  Saying that Joseph White was the one who initially Tased

11 me.

12 Q.  Okay.

13 A.  Like I said earlier to the court, I don't understand lots

14 that's going on.

15 Q.  Um-hum.

16 A.  But I do know -- I thought whenever I read that, my first

17 initial thought was he was trying to say he, he didn't have

18 anything to do with the assault, that Joseph White did.

19     So, like I said to the court, in all honesty I can't swear

20 that Joseph White did not Tase me.  All I can say I know the

21 first face that I can remember seeing immediately afterwards

22 was Jason Myers.  That's when he started kicking me.

23 Q.  Okay.  I understand your position about Jason Myers.

24 You're saying you don't know if he Tased you or not, but you do

25 know that he kicked you in the back of the head several times.

```
 1   A.   Yes, sir.
 2   Q.   And your position, for no reason, and that's -- given those
 3   allegations, he's going to remain in the case.  The question is
 4   what to do with Joseph White.  They say he is the one who Tased
 5   you.
 6   A.   Yes, I found out through my family.
 7   Q.   Oh.
 8   A.   Sorry.
 9   Q.   No, go ahead.  I'm sorry.
10   A.   My family's talked to people, and like I say, I don't know
11   how they get in touch with them or whatever, but captain of the
12   Jasper County Sheriff's Department was there when this
13   happened, and he told my family, which I know that can't be
14   promises through, but he said that, that he witnessed me
15   severely mistreated by Joseph White.  But I mean I don't know
16   who Joseph White is.  I don't.  If he was sitting here in the
17   courtroom, I wouldn't know.
18   Q.   Which captain told your family that?
19   A.   Robert Morris.
20   Q.   Robert who?
21   A.   Morris.
22   Q.   Spell his last name for me.
23   A.   M-O -- M-O-R-R-I-S, I think.
24   Q.   Okay.  Morris.  I just wanted to make sure I understood
25   you.
```

1    Regardless of who Tased you, whether it was Mr. Myers or

2  Mr. White, are you bringing a claim against the person who

3  Tased you?

4  A.  I was also -- I was bringing -- because they Tased me

5  several times, and immediately started, started stomping me --

6  Q.  No, I'm not talking about the stomping.  That's pretty

7  clear.  But if I understood your testimony, you ran, and they

8  Tased you.

9  A.  Yes, sir.

10  Q.  Beyond that, I don't know anything about the Tasing.

11    Are you claiming the Tasing was improper?  What I'm trying

12  to get at, do you want to add Mr. White to the lawsuit or not?

13  And if so, why?

14  A.  Well, if the Tasing is what caused the injury, I don't --

15  all I'm trying to understand is what caused, what caused me to

16  have a speech impediment and seizures and chronic headache.

17  Was it the Taser or was it the stomping?  I don't know.  Or was

18  it a combination of both?  I don't know that.  That's the only

19  question I was prepared to ask you is can we find out?  Can we

20  not get to a doctor and find that out?

21  Q.  Well, you're seeing doctors now and under medication.

22  A.  Yeah.  They tell me -- they tell me horrible things.  They

23  tell me I will never speak again and I'll always have seizures,

24  but I don't feel like they're qualified to tell me that.

25  Q.  Well, that's probably something you'll have to handle.

1    You'll have to -- if you want to seek a doctor's opinion,

2    you know, you can seek leave to do that.  But you don't have to

3    do that.  It's not something that somebody else necessarily

4    will pay for.  If you or your family want to do that, you have

5    an opportunity to be examined, that might be allowed.  I'm not

6    sure how you would get there, but I might would allow that.

7    But it's not something I'm going to order to be done.  If you

8    believe you've got a diagnosis that you want to use, I'll let

9    you set -- you know, set that up, but you'll have to do that

10   under court supervision.

11   But I'm not sure I understand your question.  This is not

12   a -- well, let me back up.

13   I'm just trying to figure out if you claim the Tasing was

14   wrong, not whether it caused the injury.  I'm just trying to

15   find out, do you want to add White to the lawsuit or not?  And

16   if you do, what claims are you going to make against him?

17   A.   I don't have no claim against White because I can't

18   remember seeing him.

19   I mean anything I could say would only be hearsay.

20   Q.   Okay.  Well, they pretty much stipulate now that he Tased

21   you.  You don't have to agree with that, but that's who they

22   say it was, and that's what they say the proof is going to

23   show, that they're going to show White Tased you.  They're not

24   agreeing that it was wrong to do that; they're going to say

25   they had every reason to do that because you were fleeing.

1   A.   Yes, sir.   I agree with that.   I agree with you.

2   Q.   Well, I'm stating their position.   I don't have one at

3   this, at this point.   But they're saying that White is the one

4   who Tased you.   But are you saying you do or you do not want to

5   add him to the lawsuit?

6   A.   I do not want to add him to the lawsuit.

7   Q.   Okay.   He won't be added.

8        Now, there is a motion that the defense has filed to

9   dismiss, to substitute White as a defendant in place of Jason

10  Myers.

11       I think I know what I want to do with that, but did you

12  want to -- Jessica, do you want to be heard -- Ms. Malone, do

13  you want to be heard on that any further?

14            MS. MALONE:   I believe our position is clear.   It was

15  our understanding that the claims were due to the Tasing, and

16  it seems that is not what Mr. Williams is asserting.

17       However, as a practical matter, Jason Myers is deployed,

18  and so then we run into the issue of he's not going to

19  participate in his own defense during his deployment.

20       Just to make the court aware, we may have to file a motion

21  for some sort of stay.

22       As a practical matter, he's not even going to be able to

23  offer -- provide an affidavit or offer testimony on his own

24  behalf in the suit --

25            THE COURT:   Um-hum.

1       MS. MALONE:  -- anytime soon.

2       THE COURT:  Okay.  Well, let -- all right.  Let me get

3  to the motion to substitute, then.

4    I'm obligated to deny that based on the pleadings at this

5  stage.

6    I've given Mr. Williams an opportunity to add Mr. White if

7  he wants to, and he's chosen not to, and he gets to pick his

8  own defendants.  And I guess, more importantly, he says that

9  regardless of whether Myers Tased him, and as you point out,

10  that was your understanding of how the case was developing, but

11  he says he kicked him at a time when he was unable to resist,

12  and -- several times, and so he's stated a claim.  Whether that

13  claim is ultimately meritorious remains to be seen, so I'm

14  going to deny the motion to substitute.

15    However, Ms. Malone brings up an important point.

16  Proceeding against a person deployed in the military is a

17  little dicey.

18    Typically that's not going to be allowed until that person

19  is available to defend themselves.  That wouldn't be fair.

20    But obviously he's a person that needs to be in the case.

21    Is there any indication of how long his deployment will

22  last?

23       MS. MALONE:  I'm not certain, Your Honor.

24       THE COURT:  Okay.  A couple of things.  What I would

25  like to do, and obviously you may object on behalf of Mr. Myers

1    if you feel like you need to, is to go ahead and take care of

2    discovery.  It looks like that's going to take place with or

3    without Mr. Myers, and so it will require the production of

4    records and things that would not be personal to him,

5    necessarily; allow for the medical records to be obtained;

6    enter an omnibus order, and maybe even set a motions deadline,

7    knowing, though, that you may -- once you get maybe a little

8    bit more information about his deployment, you may need to move

9    to stay that depending on what his deployment situation is.

10       But at least if we get the, the basic things done, and

11   then, then, if necessary, to stay it before the motions

12   deadline, we could, with the lack of opportunity to participate

13   in the case.

14       I would probably do maybe something like that; allows us to

15   move forward some, but not at a point where it's going to

16   prejudice him.

17       Do you have any objection to that?

18           MS. MALONE:  No objection, Your Honor.

19           THE COURT:  Like I said, if after conferring with him

20   or after looking at it you want to object, I mean you have

21   rights under the statute.  It's not my intent to undermine

22   those in any way.

23   BY THE COURT:

24   Q.  You do realize, Mr. Williams, I may have to stay the case

25   at some point.

```
 1        And I'll get as much as I can, but I may have to stay it
 2   because of that reason, and it will pick up when he returns.
 3   Do you understand?
 4   A.   Yes, sir.
 5   Q.   Okay.  All right.
 6        As for discovery, it looks as if you should provide the
 7   defendants the names of the -- and places where you've been
 8   treated for injuries that you claim.  You know, you've
 9   indicated you have seizures and have some speech difficulties
10   as a result of the incident, so I want you to be able -- you
11   need to tell them who it is that's treated you.  And you've
12   covered some of that in the hearing, but I know you have been
13   treated at the MDOC as well.
14        But the doctors who treated you, where they're located, all
15   right?
16   A.   Yes, sir.
17   Q.   And you provide that in writing within 30 days.
18        What are you asking for in the lawsuit?  What is it that
19   you want the court to do?
20   A.   When I done with this lawsuit, you know -- I'm sure you
21   already know that, it wasn't me, any of my handwriting.  I had
22   somebody doing it for me.  I don't have a clue what was
23   different.  We asked for money, of course, but that's what I
24   was trying to say earlier, I was hoping that, you know, in the
25   lawsuit -- I want, if it's in my favor, I want them to give me
```

1   through the doctor to pay for it, to see if I can be fixed, my

2   head and speech can be -- I guess you got it.

3   Q.  Well, probably best to ask for money.

4   A.  Yes, sir.

5   Q.  And if you receive an award, then it should be based on the

6   cost of whatever treatment you have to have.

7   A.  Yes, sir.

8   Q.  But I don't want to mislead you there.

9       You'll have to establish -- you will have to establish, not

10  them, because you're the plaintiff and bear the burden of

11  proof -- you would have to establish that they caused the

12  injury, and you may need medical testimony to do that, what

13  your injuries are, what the long-term prognosis is, what the

14  cost of treatments are, and those kinds of things.  Court won't

15  be able to pull a number out of the air, okay?  That's

16  something you'll be obligated to do.

17      So if you intend to pursue this, talk with your family

18  about that, and you would be wise to talk with an attorney.

19  You don't have to have an attorney --

20  A.  I can't.  I can't afford it.

21  Q.  -- to represent you, but difficult to proceed without it.

22  Typically courts don't appoint lawyers in civil cases, absent

23  some very unusual and compelling circumstances.

24      So that's -- you would be wise, whether you can afford one

25  or not, you know, if you consult with an attorney you might,

1    you might consider that.  Get your family to help you or maybe

2    a lawyer will take it on a contingency.  I don't know.  Maybe

3    not.  Very difficult to obtain lawyers in such cases.

4        All right.  But I want you to provide the information about

5    any treatment that you received for your injuries that you

6    claim they caused.

7            THE COURT:  Any other records that the defense would

8    want from the plaintiff?  I'm going to talk to him about a

9    medical authorization as well.  But any other records that the

10   defense desires?

11           MS. MALONE:  Nothing other than leave to seek his

12   medical records, Your Honor.

13           THE COURT:  All right.  Yeah, you would be authorized

14   to serve a subpoena with Department of Corrections to obtain

15   those records that are in their hands.

16   BY THE COURT:

17   Q.  You were in court a while ago, for the previous hearing,

18   and I talked about a medical authorization with the gentleman

19   in the case ahead of you; right?

20   A.  I understand, yes, sir.

21   Q.  Okay.  All right.  I'm going to ask you also to sign a

22   medical authorization.

23       When you put your medical treatment at issue, well, then

24   the people you sue have a right to look the your medical

25   records, because you're claiming that you have injuries that

1    they caused, and so they have a right to know what injuries you

2    do have.  Does that make sense?

3    A.  Yes.  Yes, sir.

4    Q.  So although you've told me you can read and write, you're

5    going to be handed a document that's called Authorization for

6    Medical Information.  It's all doctors, clinics, hospitals,

7    pharmacies, anybody who's treated you, allowing them to get

8    your medical records.  When I say *them*, that's the lawyers for

9    the people you sued, these ladies here with the law firm, along

10   with their firm, and people associated with their firm.  You

11   know, it might be an investigator, a legal assistant or

12   attorney in the firm, to request and get your records and

13   review them, and that tells the medical providers that you're

14   waiving your medical privilege, that they have the right --

15   that you permit them to give your records out, if they request

16   them.

17       And that's any records, whether it's hospital admissions,

18   doctors' notes, test results.  You mentioned a CAT scan.  They

19   might have done X-rays.  Whatever they have, that they would

20   provide them to the lawyers for the defendant.

21       I'll put an expiration date of October 1 on this, so

22   doesn't last forever, but they can't get your records forever.

23   But they can get the records up until then to make sure that

24   they understand what your medical treatment has been.  Do you

25   understand?

1    A.   Yes, sir.

2    Q.   Do you have any objection to that?

3    A.   No, sir.

4    Q.   All right.  I will require, too, as a condition of this

5    that they provide you with a copy of whatever records they

6    receive, so that you have the same thing they have.

7         All right.  You'll be handed this form.  You'll need to

8    sign it, put your Social Security and your date of birth on

9    there as well because my guess is there are a bunch of David

10   Williams out there.

11   A.   Yes, sir.

12   Q.   And want to make sure we get the right records.

13              COURT OFFICER:   (Passing document.)

14   BY THE COURT:

15   Q.   In addition to them providing -- the defendants providing

16   you with any records of medical treatment that they obtain, if

17   you filed any grievances while you were at the jail, they

18   should provide those to you.

19        Did you file any grievances while you were there?

20   A.   No, sir.  They never, never, never done -- done nothing,

21   but every time I came back from the initial time, they, they

22   had my medicine and everything, but I never got -- like they

23   sent me up to have an MRI.

24   Q.   Right.

25   A.   But every time they said they would do it, they send me

1  somewhere else.

2  Q.  All right.  But did you file a grievance about that?

3  A.  They don't have a grievance system in Jones County jail

4  that I have ever seen.

5  Q.  Okay.  All right.

6  A.  Jasper County, yes.

7  Q.  I'm just asking if you filed a grievance.  I've seen

8  grievances from that jail, not a lot of occasions, but we

9  really don't have to disagree about that.  I'm just wanting to

10  know, did you file a grievance?

11  A.  No, sir, not in Jones County.

12  Q.  Okay.  But if you did file any grievances, they'll produce

13  your jail file, for your stay while you were there for that

14  two-week period, I don't require it for further periods unless

15  you're going to use it, if you are going to use that

16  information, provide it.  So the jail file, any medical records

17  they obtain, any grievances that you filed.

18      If there is a report that was prepared outlining the events

19  for the arrest, I would like -- that should be produced.  If

20  there is an objection to producing it, then it should be

21  produced to me in camera, because I would like to see it.

22  A.  Your Honor, can I ask a question?

23      When you said the guy that did this, Joseph White is the

24  one, one that initially Tased me, I'm just speaking, I don't

25  know if I'm hurting myself or not, but I'm wondering what if,

1    what if, what if -- what if I don't have the right one?   I

2    mean, that's what I would like to know.

3        People tell me what happened, the parts, the who was there,

4    who wasn't, but I don't know him.   How would I, how would I

5    find out who?

6    Q.   Well, they're telling you that's who it is.   And that's one

7    of the reasons why I just said I would like for them to provide

8    you with the report of what happened that night, because it

9    might show who was there.

10       They have said in writing, and that's pretty strong, kind

11   of hard to back away from that, when they say in writing that

12   we agree that's who did it.   But that really doesn't answer the

13   question about whether he should be in the lawsuit.

14   A.   Yes, sir.

15   Q.   There is no question from their perspective that White is

16   the one who Tased you.   The question is whether you claim the

17   Tasing was wrong to begin with.

18       It wasn't -- you know, it's pretty clear that it could be

19   wrong if somebody is roughing you up, when you're powerless.

20   May not be as clear that Tasing you was wrong.   I don't know.

21   That's your allegation.

22   A.   All I'll say, I feel like the initial Tasing was right.

23   But whatever -- but the Tasings after that were not right.

24   Q.   Okay.   Well, --

25   A.   More than one -- the initial Tasing put me, put me down.   I

1    couldn't run no more.

2    Q.   Okay.

3    A.   So why did they, why did they continue to Tase me in the

4    stomach?  That's what I was trying to say.

5    Q.   Okay.  So you're saying after the initial Tasing, and this

6    is in your complaint, you say they continued to Tase you.

7    A.   Tase me, yes.

8    Q.   Okay.  But you said you didn't feel any pain from that.

9    A.   No, I didn't.  I didn't feel no pain.

10        I could just feel him -- he kept, kept shocking me.

11   Q.   Okay.  All right.  Well, I don't, I don't choose who is in

12   the suit.  If you want to add White, I'll let you.  If you

13   don't want to add him, then you say so.

14   A.   Well, what I'm confused by, if I add White, does it dismiss

15   Myers?

16   Q.   No.  No.  You made a claim against Myers.  They don't agree

17   that Myers Tased you.  In fact, they don't agree that you have

18   a claim against Myers at all.  But you've stated plainly that

19   Myers kicked you while you were down, when you couldn't defend

20   yourself.  So he's in the case no matter what.

21        Now that doesn't necessarily mean he'll be found liable.

22   It's too early.  This is just your side, okay?

23   A.   Okay.

24   Q.   But he gets -- but Myers is in the case.  But White's not.

25        Either you're adding him or not.

1   A.   I would like to add him if it don't dismiss --

2   Q.   It's not going to dismiss Myers?

3   A.   Yes, sir.  I'm sorry.

4   Q.   Not just by adding him.

5   A.   I'm sorry for my confusion.

6        Then yes, sir, I would like to add him.

7   Q.   All right.  I'll add White as a defendant.  And the claim

8   against him is just one, as I understand it, that he was the

9   person who Tased the plaintiff, and he continued to Tase him

10  well beyond when he should have.  That's his complaint.  That

11  doesn't mean that the court's making a finding --

12  A.   Yes, sir.

13  Q.   -- that it happened that way.

14       So I guess backing up to the motion, I'm going to grant it

15  in part and deny it in part.

16       I'm going to grant to the extent that it adds White, but

17  deny it to the part -- to the extent that it dismisses Myers,

18  because I can't dismiss him based on the claims that are made.

19       So White will be made a part of the case.

20            THE COURT:  Will y'all be representing him, Jessica,

21  or do you know?

22            MS. MALONE:  You know, I don't know.

23            THE COURT:  Okay.

24            MS. MALONE:  It will depend entirely on whether he is

25  still employed.

1       THE COURT:  I understand.

2           MS. MALONE:  I would assume he is, so --

3           THE COURT:  The order will say that he'll be added,

4    and if you intend to represent him, enter an appearance within

5    30 days.  If you need him to be served, then say so.  I'm not

6    trying to pass up process that needs to be done because I

7    recognize sometimes you may not have that option.  Or whether

8    process -- whether you would accept process for him or whether

9    it needs to be served on him directly.

10          MS. MALONE:  Yes, Your Honor.

11          THE COURT:  But I'll give you an opportunity to clear

12   that up.  That's -- it can be handled either way.  If we can do

13   it that way, that's fine; if we can't, I understand.

14   BY THE COURT:

15   Q.  Okay.  Did you have any other questions?

16   A.  Yes, sir.  One more.

17       If I have a witness, just say this lady, her husband was

18   there and he kicked me, could I subpoena her or do I have to --

19   is that -- would it hurt her?  Because she works at the

20   hospital.

21   Q.  No, I don't -- that I can't answer, and won't.  I don't

22   know what hurts people and what doesn't hurt people.

23       But right now the question is what do you do about your

24   witnesses?  Sounds to me like you have more than one.

25   A.  Yes, sir.

1  Q.  You've got that captain, who's made the statement to you,

2  and then you've got this lady you're mentioning.

3      Witnesses are people that show up for trial and testify.

4  We don't have a trial right now.  In fact, I've not heard from

5  anybody but you.

6  A.  Yes, sir.

7  Q.  Obviously, if you had a trial, you would want them there.

8      But there is another point in time when they may be

9  important to you.  They're going to move -- when I say move,

10  they're going to ask the court to dismiss the case.

11      And if you believe those witnesses have information that

12  support your claim, then you should submit that information

13  from them, affidavits, for example, sworn statements about what

14  happened, in response to their motion.  Because if you just

15  tell me, oh, I think somebody could help me, that won't be

16  enough.  I've got to have their statement.  So that would be

17  the time to have that.

18  A.  Yes, sir.

19  Q.  Okay?

20      All right.  I have outlined the things that they should

21  produce to you.

22      Do you have any requests other than those?

23      And I think I've covered grievances, the jail file, any

24  report that was made outlining who was there and what happened.

25      Anything else?

```
 1   A.  No, sir.

 2             THE COURT:  Okay.  Any other requests from the

 3   defense?

 4             MS. MALONE:  No other requests.  But, to my knowledge,

 5   I have everything that the court has ordered produced.  We have

 6   an incident report from the Taser --

 7             THE COURT:  Okay.

 8             MS. MALONE:  The Taser --

 9             THE COURT:  All right.  You have the incident report.

10             MS. MALONE:  I have the Taser report.

11             THE COURT:  The medical records?

12             MS. MALONE:  I have the jail file.  I have medical

13   records, a medical request form from the plaintiff.

14             THE COURT:  Does that include all the things in the

15   request?

16             MS. MALONE:  And he conceded he didn't file any

17   grievances, so we don't have any grievances on file for him for

18   that period of time.

19             THE COURT:  All right.  If you can leave those on the

20   table for him.

21        If you will, put a -- file a notice of compliance.

22        Wait till I get the omnibus order out to do that, because

23   it will explain what needs to be produced, and then you could

24   file that.

25        I'd also like to get a copy of the incident report or the
```

1    Taser report, whatever you call it.  You can just send it to

2    chambers.  I don't need it today.  But you can mail it to us.

3        That would be -- put that in the omnibus order.  We'll put

4    that in the omnibus order.

5        They'll leave those records for you on the table.

6        Before you leave those, make sure those are -- metal clips

7    and such are not in the file so that that doesn't create a

8    problem with the jail.

9        Should be just paper.

10            MS. MALONE:  Um-hum.

11            THE COURT:  All right.  Anything further?  Any other

12   questions, sir?

13            MR. WILLIAMS:  No, sir.

14            THE COURT:  Anything further from the defense?

15            MS. MALONE:  Nothing further, Your Honor.

16            THE COURT:  Okay.  We're going to set an October 17th

17   motions deadline.

18        We're going to follow the same procedure as the last case.

19   I'll send you the order outlining your claims.

20        Within 30 days you need to give them the information I

21   said, doctors and things, within 30 days.  In fact, I think

22   you've already got their records.  But they'll file a notice.

23   They get medical records, they'll send them to you.

24        I need motions to be filed, if any, by the 17th.  If there

25   is a motion filed, you always have two weeks to respond to it.

1        They are likely going to ask the court to stay the case,

2    that is, stop this fairly soon, because he's deployed; and if

3    so, I'll let you respond to that.

4        I think I'm obligated in most cases to grant that.

5        So that could happen, so just be aware of that.  All right?

6            MR. WILLIAMS:  Yes, sir.

7            THE COURT:  All right, then.  If there is nothing

8    further, then, we'll be, we'll be adjourned.

9        Thank you.

10           COURT OFFICER:  All rise.

11       (Proceedings concluded at 3:14 p.m.)

CERTIFICATE OF COURT REPORTER

I, Fred W. Jeske, RMR, CRR, Official Court Reporter for the United States District Court for the Southern District of Mississippi, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a correct transcript of the proceedings reported by me using the stenotype reporting method in conjunction with computer-aided transcription, and that same is a true and correct transcript to the best of my ability and understanding.

I further certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

s/*Fred W. Jeske*

FRED W. JESKE, RMR, CRR
OFFICIAL COURT REPORTER